# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 20, 2025          Decided June 6, 2025

No. 24-1094

APPALACHIAN VOICES, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MOUNTAIN VALLEY PIPELINE, LLC AND PUBLIC SERVICE
COMPANY OF NORTH CAROLINA, INC., D/B/A DOMINION
ENERGY NORTH CAROLINA,
INTERVENORS

———

Consolidated with 24-1150

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Benjamin A. Luckett* argued the cause for petitioners. With him on the briefs were *Elizabeth F. Benson*, *Gillian Giannetti*, and *Caroline Reiser*.

*Jason T. Perkins*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Jeremy C. Marwell* argued the cause for intervenors in support of respondent. With him on the joint brief were *Charlotte Taylor*, *James Olson*, *Misha Tseytlin*, *James T. Dawson*, *Garrett T. Meisman*, and *William Lavarco.*

Before: SRINIVASAN, *Chief Judge*, HENDERSON, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Concurring opinion filed by *Circuit Judge* HENDERSON.

EDWARDS, *Senior Circuit Judge*: This case concerns a decision of the Federal Energy Regulatory Commission ("FERC" or "Commission") finding good cause to extend a construction deadline it had previously set for Mountain Valley Pipeline, LLC ("MVP") to complete the MVP Southgate Project ("Southgate Project" or "Southgate"). The Commission issued a certificate of public convenience and necessity authorizing the Southgate Project in June 2020. The Commission exercised its discretion to set a construction completion deadline of June 18, 2023. It recognized that Southgate functioned as an extension of the Mountain Valley Pipeline Mainline ("Mainline"), so it conditioned authorization to start Southgate construction on MVP obtaining all required federal permits and authorizations for the Mainline. However, permitting issues for the Mainline were not resolved until June 3, 2023, and the Commission did not authorize resumption of Mainline construction until June 28, 2023. By then,

Southgate's initial construction deadline of June 18, 2023, had already passed.

Shortly before the deadline, MVP requested an extension of time to complete construction. The Commission granted the request, finding that MVP had adequately demonstrated good cause. Specifically, MVP had made a good faith effort to meet the Southgate construction deadline but encountered unavoidable circumstances – *i.e.*, Mainline permitting delays – that prevented it from doing so. The Commission also explained that its prior analysis of market need and environmental impacts for the Southgate Project remained valid and, thus, declined to revisit them.

Petitioners – eight environmental organizations – seek review of the Commission's decision. They argue that the Commission's finding of good cause to extend the time to complete construction and its refusal to revisit its prior assessments of market need and environmental impacts were arbitrary and capricious.

We deny the petitions for review. First, we hold that the Commission reasonably found that MVP had satisfied the good cause standard in seeking an extension. As the Commission explained, permitting and litigation delays with the Mainline prevented MVP from proceeding with Southgate construction. Thus, by focusing their efforts on securing authorization for the Mainline, which had to come first, MVP made a good faith effort to meet the original Southgate deadline.

Second, we hold that the Commission's decision not to revisit its prior findings on market need and environmental impacts was adequately explained. The Commission generally declines to reevaluate issues that were already addressed during the certification process. The Commission "has leeway,

however, to revisit prior market-need or environmental findings when new circumstances render such findings stale or out of date." *Sierra Club v. FERC*, 97 F.4th 16, 26 (D.C. Cir. 2024). On the record before it, the Commission reasonably concluded that the information presented by petitioners did not amount to significant changes in circumstances that merited renewed economic or environmental analysis. It was also reasonable for the Commission to wait for MVP to file a certificate amendment application before addressing any potential changes to Southgate, and to conduct further economic and environmental analysis, as necessary, when reviewing that application.

## I. BACKGROUND

### A. *Statutory and Regulatory Background*

The Natural Gas Act ("NGA"), 15 U.S.C. § 717 *et seq.*, empowers the Commission to regulate the interstate transportation and sale of natural gas. A company seeking to construct new natural gas pipeline facilities must receive authorization from the Commission by applying for a certificate of "public convenience and necessity." 15 U.S.C. § 717f(c)(1)(A). The Commission will issue a certificate if it finds that (1) "the applicant is able and willing properly to do the acts and to perform the service proposed," in conformance with the NGA and the Commission's "requirements, rules, and regulations"; and (2) the proposed project "is or will be required by the present or future public convenience and necessity." *Id.* § 717f(e). Prior to issuing a certificate, the Commission "undertakes an extensive analysis of market need, the public interest, and any environmental effects of the proposed project." *Sierra Club*, 97 F.4th at 20; *see also* 15 U.S.C. § 717f(e). The project is also examined under the National Environmental Policy Act ("NEPA") through the

issuance of either an environmental assessment or an environmental impact statement ("EIS"). *See Sierra Club*, 97 F.4th at 20; 42 U.S.C. § 4321 *et seq.*

The NGA does not require the Commission to set deadlines for the completion of construction projects. However, the Commission has the authority to "perform any and all acts" to "prescribe, issue, make, amend, and rescind" a certificate order, "as [the agency] may find necessary or appropriate to carry out the [NGA]." 15 U.S.C. § 717*o*. And under its own regulation, "[a]ny authorized construction [or] extension . . . shall be completed and made available for service . . . within [a] period of time to be specified by the Commission in each order." 18 C.F.R. § 157.20(b) (2024) (cleaned up).

The Commission may grant extensions of time for project completion "for good cause, upon a motion made before" the operative deadline. *Id.* § 385.2008(a). "Good cause" is the only showing that a certificate holder is required to make if the extension request is filed "within a timeframe during which the environmental and other public interest findings underlying the Commission's authorization [of the project] can be expected to remain valid." *Algonquin Gas Transmission, LLC*, 170 FERC ¶ 61,144, at P 15 (2020). An extension of time is considered an amendment of the project-completion deadline in the certificate order and thus pursued as part of the Commission's broad authority under § 717*o* of the NGA. *See* 15 U.S.C. § 717*o*.

When a certificate holder applies for an extension, the Commission publishes the application so that parties to the underlying proceeding can provide comments about whether the extension should be granted. *See Algonquin Gas*, 170 FERC ¶ 61,144, at P 39. If the Commission issues an extension order, opponents can submit a request for rehearing. *See* 15

U.S.C. § 717r(a). The Commission can deny rehearing by operation of law when it declines to act on the rehearing request within thirty days. *Id.*; 18 C.F.R. § 385.713(f) (2024). The Commission can also deny the rehearing request and modify the discussion in the underlying extension order to address issues raised on rehearing, while continuing to reach the same result. *See* 15 U.S.C. § 717r(a); *see also Allegheny Def. Project v. FERC*, 964 F.3d 1, 16-17 (D.C. Cir. 2020) (en banc). After parties to a proceeding exhaust their arguments before the Commission by seeking rehearing, they may petition for review of the Commission's decision in this court. 15 U.S.C. § 717r(b). We have jurisdiction over a timely petition for review under 15 U.S.C. § 717r(b).

**B.   *Factual and Procedural History***

1.   The Commission's Certificate Order

On November 6, 2018, MVP applied to the Commission for a certificate of public convenience and necessity to build the Southgate Project. MVP proposed Southgate as an extension of the Mainline, a 303.5-mile-long pipeline approved by the Commission in 2017 to carry gas from northern West Virginia to southern Virginia. Southgate would extend the pipeline into North Carolina, running approximately 75 miles from the Mainline's terminus in Virginia to two delivery points in North Carolina. Those delivery points are owned by Dominion Energy North Carolina ("Dominion"), a local distribution company that executed a binding, long-term precedent agreement with MVP for 80 percent of Southgate's transportation capacity.

On June 18, 2020, the Commission issued a certificate of public convenience and necessity authorizing the Southgate Project. Order Issuing Certificate, *Mountain Valley Pipeline,*

*LLC*, 171 FERC ¶ 61,232, at PP 1-2 (2020) ("Certificate Order"). When assessing for market need, the Commission accepted the Dominion precedent agreement as a showing of need for Southgate. *Id.* at P 51. The Commission noted that "[p]rojections regarding future demand" on a regional basis "often change and are influenced by a variety of factors." *Id.* at P 41. Therefore, "[g]iven the uncertainty associated with long-term demand projections . . . where an applicant has precedent agreements for long-term firm service, the Commission deems the precedent agreements to be the better evidence of demand." *Id.* The Commission also observed that the "project shipper is a local distribution company, which will locally distribute gas to residential, commercial, and industrial end-use customers." *Id.* at P 43.

As for environmental impacts, several environmental organizations submitted comments on the draft EIS for Southgate. Appalachian Voices, among others, explained that the Commission could not rely on its standard erosion and sediment control measures to conclude that the impact of pipeline construction would not be significant. They pointed out that the Commission had relied on those same measures to conclude that the Mainline's impacts would be adequately minimized, when in fact Mainline construction had resulted in substantial, widespread erosion and sedimentation control failures.

In the final EIS, and in an order addressing arguments raised on rehearing, the Commission explained that MVP was required to follow the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* ("Erosion Plan") and the Commission's *Wetland and Waterbody Construction and Mitigation Procedures* ("Mitigation Procedures") as modified for Southgate, as well as to employ environmental inspectors to ensure compliance. *See* Order Addressing Arguments Raised

on Rehearing and Stay, *Mountain Valley Pipeline, LLC*, 172 FERC ¶ 61,261, at PP 27-28 (2020) ("Certificate Rehearing Order"). The Commission also determined that Southgate would not experience the same issues because (1) the Mainline violations were a result of record-breaking precipitation events in 2018 and (2) Southgate traversed flatter terrain than the Mainline. The Commission also noted that MVP had agreed to implement supplemental control measures, such as monitoring weather conditions during construction and appropriately adjusting erosion control measures as necessary to minimize the impacts from heavy precipitation events. In its order addressing arguments raised on rehearing, the Commission further explained that instances of non-compliance at other projects do not support a conclusion that the Erosion Plan, Mitigation Procedures, and other measures are fatally flawed or that the construction of Southgate will necessarily face similar challenges as other pipeline projects. *See* Certificate Rehearing Order, 172 FERC ¶ 61,261, at P 28. Rather, the Commission understood the agreed-upon measures for Southgate to provide adequate erosion and sediment control. *Id.*

Finally, the Commission required MVP to make the Southgate Project available for service by June 18, 2023. However, the Commission recognized that Southgate functioned as an extension of the Mainline and that, at the time, Mainline's construction had been suspended due to a stop-work order issued after various litigation and permitting issues. Accordingly, the Commission conditioned authorization to start Southgate construction on (1) MVP obtaining all required federal permits for the Mainline and (2) construction resuming under the Mainline's certification. Certificate Order, 171 FERC ¶ 61,232, at P 9.

2. This Court's *Southgate* Decision Affirming the Commission's Certificate Order

After the issuance of the Certificate Order and the agency's denial of rehearing for the Southgate certificate, six environmental groups petitioned for review in this court. *Sierra Club v. FERC* (*Southgate*), 38 F.4th 220, 227-28 (D.C. Cir. 2022). In that appeal, the petitioners did not challenge the Commission's finding of market need. Nevertheless, this court noted that "the long-term agreement shows an actual need for the Project." *Id.* at 230. The petitioners did challenge the Commission's EIS as inadequate regarding mitigation measures related to sedimentation and erosion. *Id.* at 232. But this court found "that the Commission discussed potential mitigation measures for erosion and runoff in detail." *Id.* Although NEPA required consideration of mitigation measures, "it does not mandate the form or adoption of any mitigation" activities in particular. *Id.* (citation omitted). Accordingly, this court found that the Commission's "fulsome" discussion and consideration of mitigation measures – together with the Commission's imposition of monitoring, inspection, and compliance activities – "meets NEPA's mark." *Id.* at 233.

3. MVP's Construction Deadline Extension Request

From 2020 to 2023, MVP remained embroiled in various legal challenges which delayed Mainline construction. *See, e.g.*, *Wild Va. v. U.S. Forest Serv.*, 24 F.4th 915, 920 (4th Cir. 2022) (vacating Forest Service and Bureau of Land Management authorizations for the Mainline). MVP did not receive authorization from the Commission to resume Mainline construction until June 28, 2023, and, by then, the Southgate

Project's original construction deadline of June 18, 2023, had already passed. *See* Order Granting Extension of Time Request, *Mountain Valley Pipeline, LLC*, 185 FERC ¶ 61,208, at PP 3-4 (2023) ("Extension Order").

On June 15, 2023, shortly before the original deadline, MVP requested a three-year extension of time to complete Southgate, primarily citing delays in constructing the Mainline. *See id.* at PP 1, 3, 5. Good cause existed for an extension, MVP contended, because of how the Commission had sequenced its approvals of MVP construction activities. The Commission had "required construction to resume on the Mainline System before construction of the Southgate Project could commence," yet the Mainline's federal authorizations had only been ratified and approved days earlier. *See id.* at PP 4-5. Having focused primarily on clearing the way for Mainline completion, MVP sought to resume Southgate permitting efforts once Mainline issues had been resolved. *See id.* at P 5 & n.13 (noting that the North Carolina Department of Environmental Quality had denied Southgate's water quality certification based on "the status of the Mainline System's completion").

The Commission received numerous public comments on the extension request, including from petitioners. They argued that MVP's failure to take reasonable steps to advance the Southgate Project prohibited a finding of "good cause" for MVP's requested extension. They also claimed that the Certificate Order's market-need and environmental analyses were no longer valid given changed circumstances.

4.   The Commission's Extension Order

On December 19, 2023, the Commission granted MVP's request and extended Southgate's certificate for an additional three years until June 18, 2026. *See* Extension Order, 185

FERC ¶ 61,208, at PP 1, 28. It explained that, under Commission policy, it reviews extension requests "on a case-by-case basis" and will generally "grant extensions of time when a project sponsor demonstrates that good faith efforts to meet a deadline have been thwarted," including with respect to permitting issues. *Id.* at P 14 (cleaned up). MVP met the good cause standard because the Commission had required Mainline construction to proceed first, and that effort had encountered significant delays. *See id.* at P 15. It was thus "reasonable for Mountain Valley to . . . expect that it was all but impossible to meet the Certificate Order's in-service date" when, only earlier that month, Mainline construction had been "jumpstarted by the passage of the Fiscal Responsibility Act of 2023." *Id.*; *see also id.* at P 4 (noting that the Act, which approved all federal authorizations for the Mainline, was signed into law on June 3, 2023).

The Commission also found that its market-need and environmental impact conclusions remained valid. The Commission determined that "[n]one of the matters raised by commenters—*e.g.*, the investment decisions of the shipper, increased regional capacity, state emissions reductions targets, and the Inflation Reduction Act clean energy incentives—undermine[d] the Commission's previous finding that the project is needed." *Id.* at P 17. The Southgate Project remained supported by a long-term precedent agreement for 80 percent of Southgate's certificated capacity and only the timing – and not the nature – of the Project was before the Commission. *Id.* at PP 16, 19.

Regarding commenters' environmental concerns about the Mainline's erosion and sedimentation events, the Commission disagreed that those concerns amounted to significant pieces of new information or that those issues would necessarily reoccur during Southgate construction. *Id.* at PP 25-26. The

Commission reviewed the Virginia Department of Environmental Quality ("VDEQ") reports cited by commenters, wherein the Virginia agency states that the impacts of the incidents during the construction of the Mainline have not been significant. *Id.* at P 27 ("VDEQ notes that neither its inspectors nor the public have reported any evidence of violations of its water quality standards or of a fish kill during construction on the mainline."). The Commission also responded to comments from Wild Virginia, a non-governmental environmental organization, regarding pollution incidents during Mainline construction that had been documented in Wild Virginia's various published reports. *Id.* at P 24. The agency dismissed this evidence in light of the VDEQ's conclusions, based on the daily presence of inspectors in the field during construction. *Id.* at PP 25-27.

5.  MVP's Project Update

On December 29, 2023, MVP informed the Commission that, after further discussion with Southgate's intended customers, it had entered into new precedent agreements with Dominion, as well as another investment grade utility customer, for nearly double the amount of gas transportation service than what had previously been agreed to. Letter from Matthew Eggerding, Deputy Gen. Couns., Mountain Valley Pipeline, LLC, to Kimberly D. Bose, Sec'y, Fed. Energy Regul. Comm'n 1-2 (Dec. 29, 2023) [hereinafter MVP Project Update Letter], Joint Appendix ("J.A."), 360-61. MVP also described a change in project design. The original project consisted of around 31.2 miles of 24-inch-diameter natural gas pipeline running from Virginia to Rockingham County, North Carolina, plus another 43.9 miles of smaller pipeline that would continue to Alamance County, North Carolina. *See* Certificate Order, 171 FERC ¶ 61,232, at P 11. The redesigned project would instead consist of approximately 31 miles of larger, 30-inch

diameter pipes running from Virginia to planned new delivery points in Rockingham County, North Carolina. *See* MVP Project Update Letter at 1, J.A. 360. The Southgate Project would no longer extend to Alamance County. *See id.* MVP clarified in the update that it had not yet "finalize[d] the scope and timeframe of the redesigned project" and that it would "provide additional information to the Commission . . . as it continue[d] with project development." *Id.* at 2, J.A. 361.

6.  The Commission's Rehearing Order

On January 18, 2024, the petitioner-organizations requested a rehearing of the Extension Order, raising many of the same concerns advanced in prior comments. *See* Appalachian Voices et. al, Request for Rehearing and Abrogation of Order Granting Extension of Time Request (Jan. 18, 2024), J.A. 362-93. They also raised new concerns regarding MVP's project update, arguing that MVP had "expressly abandoned any intention of building the project" the Commission had certificated. *Id.* at 12, J.A. 373. In their view, MVP had "failed to actively pursue" the certificated project and was working towards a different project instead. *Id.* at 8, J.A. 369. As such, the Commission's finding of good cause was arbitrary and capricious and, accordingly, the Extension Order had to be set aside. The organizations acknowledged, however, that MVP had not yet asked the Commission to amend Southgate's certificate. *Id.* at 11, J.A. 372. They also acknowledged that plans for the potential redesign of the project remained too indefinite for the Commission to undertake a full review of it under NGA or NEPA. *Id.*

On February 20, 2024, the Commission denied the rehearing request. Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, *Mountain Valley Pipeline, LLC*, 186 FERC ¶ 62,069 (2024). In its order

addressing issues raised on rehearing, the Commission sustained its prior findings of market need and environmental impacts, as well as its finding of good cause. Order Addressing Issues Raised on Rehearing, *Mountain Valley Pipeline, LLC*, 187 FERC ¶ 61,039, at P 10 (2024) ("Rehearing Order"). The Commission also explained that the organizations' argument regarding the project update proceeded from a mistaken premise. That is, they incorrectly asserted that by contemplating a redesign of the project, Mountain Valley was abandoning it. *See id.* at P 13. MVP's statements were to the contrary, the Commission explained, and it was not unusual or incompatible for a project sponsor to contemplate a project amendment as well as to seek a construction deadline extension. *Id.* at PP 13-15.

The Commission further rejected the practical import of the organizations' argument, explaining that MVP should not be required to apply for a new certificate to account for a potentially redesigned project. Instead, "a certificate amendment would be the appropriate means to account for any changes to the project as previously certificated." *Id.* at P 10 n.24. It was sufficient, the Commission found, that MVP continued to have precedent agreements covering "not only the majority of the capacity of the original certificated project but also the increased capacity of the revised project." *Id.* at P 16. And the Commission made clear that any certificate amendment application MVP might submit in the future would be evaluated under the relevant standards of the NGA and NEPA. *Id.*

Appalachian Voices, along with other environmental organizations, then filed timely petitions for review of the Commission's decision orders with this court.

7. Subsequent Developments

On February 3, 2025, MVP filed an application with the Commission to amend Southgate's certificate of public convenience and necessity. As previously explained, the proposed project, as amended, will consist of a shorter but wider pipeline extending from the original receipt points in Virginia to reach delivery points in North Carolina. The project will serve the same local shipper, Dominion, as well as one other shipper. The project is thus supported by two precedent agreements for long-term firm service. The amendments will avoid the need for a new compressor station and result in fewer river crossings. MVP claims that these modifications are a "reaction to permitting obstacles (including several state permit denials) combined with increased shipper demand." Br. of Respondent-Intervenor 21.

In response to petitioners' concerns regarding MVP's exercise of its eminent domain power under the Southgate certificate, MVP has emphasized, both in its briefing and at oral argument, that it "voluntarily dismissed all eminent domain actions in North Carolina when it became clear that portion of the route would not proceed." *Id.* at 24. MVP has given us no reason to suspect that it intends to renew such actions for portions of the route that it no longer intends to pursue, nor does MVP suggest that it has the power of eminent domain over portions of the new proposed route that is still currently pending before the Commission. Moreover, any exercise of MVP's eminent domain power will be properly scrutinized in state condemnation proceedings, where affected parties can raise and present their concerns.

MVP anticipates, and the Commission has explained, that the agency will analyze the proposed changes, precedent agreements, and accompanying environmental and other

information, and will conduct additional analysis, as appropriate, under the NGA and NEPA. *See id.* at 28-29; Rehearing Order, 187 FERC ¶ 61,039, at P 16. The Commission will do so as part of the certificate amendment proceeding, where petitioners can challenge the project as modified. These proceedings are ongoing, and the agency has not yet issued a decision as to MVP's certificate amendment application.

The Commission's forthcoming decision regarding the amendment application is distinct and separate from its prior decision granting the extension request, which is the sole agency decision before this court.

## II. ANALYSIS

### A. *Standard of Review*

The Commission's authority to establish and extend construction deadlines comes from its broad power to "perform any and all acts" to "prescribe, issue, make, amend, and rescind" a certificate of public convenience and necessity – a power that may be exercised whenever the Commission deems it "necessary or appropriate to carry out the [NGA]." 15 U.S.C. § 717*o*. Stemming from this same authority, the Commission has substantial discretion to revisit its prior findings of market need or environmental impacts as "necessary or appropriate." *Id.*; *see also Sierra Club*, 97 F.4th at 26; *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392, 394-95 (2024).

The Commission's assessment of what is necessary or appropriate – whether in the context of extending deadlines or revisiting prior findings – is "entitled to substantial deference" because it involves "a judgment . . . [of] regulatory policy at the core of FERC's mission." *Sacramento Mun. Util. Dist. v.*

*FERC*, 616 F.3d 520, 533 (D.C. Cir. 2010) (citation omitted); *see also Sierra Club*, 97 F.4th at 26. Such a decision also necessarily relies on the Commission's technical expertise. *See Sacramento Mun. Util. Dist.*, 616 F.3d at 533 (requiring deference to "technical inquir[ies] properly confided to FERC's judgment").

Accordingly, our review of the Commission's action is "limited." *Tenn. Gas Pipeline Co. v. FERC*, 860 F.2d 446, 452 (D.C. Cir. 1988). "The Commission has broad discretion in exercising its authority under the Natural Gas Act." *Id.* The Commission's discretion is limited only by the arbitrary and capricious standard of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706(2)(A). Under this standard, the Commission's action will be upheld if it is "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). In other words, we must uphold the decision if the Commission has "examine[d] the relevant [considerations] and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).

**B. *The Commission's Finding of Good Cause to Extend the Construction Deadline Was Reasonable***

The Commission generally grants a timely application for an extension of a construction deadline if the project sponsor demonstrates "good cause" for its request. 18 C.F.R. § 385.2008(a) (2024). Good cause "can be shown by a project sponsor demonstrating that it made good faith efforts to meet its deadline but encountered circumstances beyond its control." *Nat'l Fuel Extension Order*, 179 FERC ¶ 61,226, at P 10 (2022). As this court has noted, the Commission has found that

sponsors made good faith efforts where they "advanced their projects by applying for permits, engaging in litigation, acquiring necessary land rights, or negotiating with state agencies." *Sierra Club*, 97 F.4th at 24. And in examining reasons for delay, the Commission has found a wide range of circumstances to support good cause, including legal or litigation-related barriers. *See id.* at 24-25 (citing examples).

In this case, the Commission found good cause because MVP made reasonable efforts to advance its project by focusing on the most pressing and immediate problem: resuming Mainline construction. The Commission understood MVP's efforts with respect to the Mainline as a good faith effort to meet the Southgate construction deadline. *See id.* at 27 ("FERC may decide, in its discretion, that other types of reasonable efforts, other than 'active pursuit' of all permits, are sufficient." (internal citation omitted)). As the Commission explained, since securing authorizations and permits for the Mainline was a condition precedent to starting construction on Southgate, it was reasonable for MVP to "prioritize[] its efforts on the Mainline System over its attempts to resolve permitting issues for the Southgate Project." Extension Order, 185 FERC ¶ 61,208, at P 15. Indeed, as a practical matter, since Southgate is an extension of the Mainline, without the latter, any permits or land rights secured for the former would be of little to no use. Ultimately, however, because delays with the Mainline – which were factors beyond MVP's control – persisted until June 2023, it was impossible for MVP to meet the original deadline for Southgate. In light of these circumstances, the Commission's finding of "good cause" was consistent with its past practice of granting extensions to account for litigation delays, and it was well "within the bounds of reasoned decisionmaking." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983).

Petitioners argue, however, that MVP abandoned efforts to secure permits and property rights for the certificated project and did so for reasons within its control: its decision to pursue a markedly different project in lieu of the original project. As explained by the Commission, however, this argument stems from a mistaken premise. By contemplating a redesign of the project, MVP was not – and is not – abandoning it. Project sponsors often propose to amend their certificated projects to account for changes, and this practice is compatible with seeking and granting extensions of time. *See, e.g.*, *Mountain Valley Pipeline, LLC*, 185 FERC ¶ 61,193, at PP 14-15 (2023) (order amending cost-based resource rates following two extensions of time for the initial certification); *Mountain Valley Pipeline, LLC*, 179 FERC ¶ 61,013, at PP 1, 5 (2022) (order amending construction route and methods following grant of extension of time for certificate); *Algonquin Gas Transmission, LLC*, 174 FERC ¶ 62,179, at PP 1-2 (2021) (order simultaneously granting extension of time and amending certificate to modify the project facilities). In this case, the Commission permissibly determined that MVP's contemplated amendments – for example, removing the need for a new compressor station and securing additional agreements for firm capacity – demonstrate "a good faith effort toward project completion," not an intent to abandon the project. Rehearing Order, 187 FERC ¶ 61,039, at PP 7, 13.

Moreover, at the time of the request for rehearing, the contemplated redesigns were still only "speculative." *Id.* at P 14. MVP had not yet filed an application to amend the Southgate Project and, indeed, was still in the process of finalizing the scope of the project. There were no proposed amendments for the agency to review. And, as the Commission explained, "the prospect that the project may be amended in the future does not change the underlying consideration of an extension of time," which is based on the "good cause"

standard. *Id.* at P 15; *see also* Extension Order, 185 FERC ¶ 61,208, at P 11. Thus, having found "good cause," the Commission reasonably decided to grant the extension request and to wait for any forthcoming amendment application before assessing any project changes. *See Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230 (1991) (explaining that the Commission "enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures, . . . and priorities" (internal citations omitted)); *see also PennEast Pipeline Co., LLC*, 170 FERC ¶ 61,138, at PP 7-8, 16-19 (2020) (granting extension of time and noting possible forthcoming amendments).

Certification amendments and extensions of time are distinct requests governed by distinct standards. That is, while an extension request is scrutinized for good cause, any forthcoming amendment will be assessed under NEPA for its environmental impacts and the NGA to ensure the amendment is required by public convenience and necessity. *See* Rehearing Order, 187 FERC ¶ 61,039, at P 16. This future inquiry, when it becomes necessary, will ensure that any changes proposed by MVP are subject to agency review.

## C. *The Commission Reasonably Declined to Revisit its Prior Findings on Market Need and Environmental Impacts*

"The foregoing framework for determining 'good cause' to extend a construction deadline assumes that the facts and determinations underlying the original certificate approval have not changed." *Sierra Club*, 97 F.4th at 25. Where there has been no significant change in the relevant circumstances, the Commission generally declines to reevaluate issues that already were addressed when the agency first approved the project. The Commission "has leeway, however, to revisit prior

market-need or environmental findings when new circumstances render such findings stale or out of date." *Id.* at 26.

In this case, we defer to the Commission's determination that the relevant circumstances did not change substantially enough for the agency to revisit its underlying findings. *See Sacramento Mun. Util. Dist.*, 616 F.3d at 533. Contrary to petitioners' contentions, the Commission's determination was both supported by the record evidence and reasonable.

First, the "Certificate Order found a market need for the project based on Mountain Valley's execution of long-term precedent agreements for 80% of the project's capacity." Extension Order, 185 FERC ¶ 61,208, at P 17 & n.53 (citing Certificate Order, 171 FERC ¶ 61,232, at P 29). As the Commission explained, this finding of market need remains valid because "Mountain Valley continues to have precedent agreements in place that meet or exceed those for the certificated Southgate Project." Rehearing Order, 187 FERC ¶ 61,039, at P 14. Whether or not MVP has demonstrated market need for the increased capacity of any revised project is a separate question not currently before us – the agency will answer this question in the first instance if required to consider an MVP amendment application. Further, we are not persuaded that the other developments cited by petitioners – *e.g.*, high-level gas usage statistics, state emissions reductions targets, and the Inflation Reduction Act clean energy incentives – amount to significantly changed circumstances that render stale the Commission's prior analysis, especially under our deferential standard of review. *See* Extension Order, 185 FERC ¶ 61,208, at P 17.

Still, petitioners argue that the Commission should have more closely scrutinized the details of the agreements and

considered additional factors, such as demand projections. They cite this court's decision in *Environmental Defense Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021), which overturned the Commission's finding of public convenience and necessity based on a single precedent agreement with an affiliated shipper. Petitioners' argument misses the mark. As the Commission explained, *Environmental Defense Fund v. FERC* concerned the grant of an initial certificate, not an extension of time for an already issued certificate. *See* Rehearing Order, 187 FERC ¶ 61,039, at P 10 n.25. At this later stage, the scope of the agency's assessment is narrow: The question is not whether, after an extensive balancing of all public benefits and adverse effects, there is market need to justify the project. Rather, the question is whether there has been a significant change in circumstance that undermines the Commission's previous finding that the certificated project is needed. The petitioners have not demonstrated such a circumstance.

Second, as for environmental impacts, the Commission already addressed the petitioners' sedimentation and erosion concerns for the Southgate Project during the certification process. As this court explained, "the Commission discussed potential mitigation measures for erosion and runoff in detail," and the Commission adequately "distinguishe[d] these measures from those that failed for Mountain Valley in the past." *Southgate*, 38 F.4th at 232-33. Petitioners have not presented new and substantial evidence suggesting that the different and additional mitigation measures proposed for Southgate are nevertheless insufficient with respect to the protection of either soil or aquatic resources. As for the evidence the petitioners have presented, the agency adequately addressed them and explained why the proffered evidence did not justify a renewed environmental analysis. *See, e.g.*, Extension Order, 185 FERC ¶ 61,208, at P 27 (explaining that the erosion and sedimentation control failures cited by

petitioners were found by VDEQ to not have had a significant impact on water quality or fish life).

Lastly, the Commission's decision not to conduct a supplemental NEPA analysis before granting the request for an extension was also reasonable. As the Commission explained, as of the time of the Rehearing Order, MVP had not "made significant or substantial changes to the Southgate Project that would trigger a supplemental NEPA analysis, and Appalachian Voices ha[d] not presented evidence to dispute this finding." Rehearing Order, 187 FERC ¶ 61,039, at P 19; *see also Sierra Club*, 97 F.4th at 26 ("[D]eference also is due to a FERC determination about whether a supplemental environmental analysis is necessary under NEPA."). Any future proposals to amend the project, including MVP's pending amendment application, will be studied separately under NEPA. An extension request, however, is not an opportunity for opponents to relitigate their concerns with the certificate order, nor an opportunity to preemptively challenge potential project changes that have not yet been made.

## III. CONCLUSION

The Commission enjoys broad discretion in determining whether a project sponsor has demonstrated "good cause" for an extension and whether circumstances have changed enough to warrant revisiting the agency's findings justifying approval of the project. Because the Commission acted well within its discretion in both instances, we deny the petitions for review.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring: America was once a nation that built. In just over a year, we erected the world's tallest building: the Empire State Building. Between 1915 and 1925, we doubled the percentage of U.S. homes with electrical service, from 20 to 40 per cent. By 1940, we doubled those figures again. But that progress has subsequently ground to a halt. Since 1970, productivity growth in the construction industry has been on an unyielding decline. Our power grid has become bottlenecked. We have more pipelines in service today that were built pre-1970 than in the fifty-five years since. The sources of our slowdown are myriad. But one driving factor of our national sclerosis has been lawsuits such as this one.

Petitioners—a collection of environmental groups—have developed a cottage industry that uses the nation's environmental laws to retard new development. Petitioners deluge permitting agencies with dubious claims. The agencies spend years writing thousands of pages of environmental review in an attempt to stave off litigation. Often, however, no sooner do agencies approve new development than they find themselves under a tidal wave of litigation from environmental groups. These groups do not need to win their lawsuits. Indeed, they rarely do. Yet they emerge victorious because delay is the coin of the realm. Developers—overwhelmed by the torrent of challenges—often abandon their projects rather than weather the storm. Many more are cowed from even entering the market.

Today's case is typical. Petitioners waged an unrelenting campaign to drive Intervenor Mountain Valley from the natural gas market. For years, they launched challenge after challenge to every state and federal permit necessary to the construction of Mountain Valley's flagship project, Mainline. That campaign was only ended when the Congress approved all of Mountain Valley's permits and stripped the federal courts of jurisdiction to entertain further suits. With Mainline now out

of reach, Petitioners have turned to its spin-off project, Southgate. Both FERC and this Court upheld Southgate's environmental review and market analyses. But because Petitioners caused so many years of delay, Mountain Valley was forced to seek an extension of its deadline. That extension request has become a beachhead for a fresh assault.

Petitioners argue that their past efforts have so delayed Southgate that FERC's analyses are now stale. They ask us to send the agency back to the drawing board to assess conditions from scratch. As today's majority correctly holds, their claims are without merit. FERC properly found that its market and environmental analyses remain valid and that good cause exists to grant Mountain Valley an extension. And, as is so often the case, Petitioners' remaining objections may be resurrected in future Commission proceedings, where they will receive yet another bite at the apple.

In sanctioning this system, I believe courts—ours in particular—have misinterpreted and misapplied the environmental laws. In the process, we have enabled interest groups to transform the bench into a tool to stymie any new development. It is long past time to correct our mistake.

## I. BACKGROUND

### A. Statutory Background

In the early twentieth century, "development began in earnest on the country's [natural gas] pipeline infrastructure." *PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 489 (2021). At first, states were the primary movers in regulating the industry. But their efforts were quelled by the Supreme Court, which held that the Constitution's Dormant Commerce Clause prohibits states from regulating the interstate transportation and sale of electricity and fuel. *See Missouri ex*

*rel. Barrett v. Kansas Nat. Gas Co.*, 265 U.S. 298, 307–308 (1924); *Public Util. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89–90 (1927). The Congress responded with a pair of landmark statutes.

In 1935, it amended the Federal Power Act (FPA), which created the Federal Power Commission (FPC)—the forebearer of today's Federal Energy Regulatory Commission (FERC or the Commission)—and empowered it to regulate the transmission and sale of electricity in interstate commerce. Ch. 687, § 201, 49 Stat. 847, 847–48 (codified as amended at 16 U.S.C. § 824(a)–(b)). In 1938, the Congress enacted the Natural Gas Act (NGA), which gave the newly-minted FPC exclusive authority to regulate the transportation and sale of natural gas in interstate commerce. Pub. L. No. 75-688, ch. 556, 52 Stat. 821. Under section 7 of the NGA, no company may construct or extend a natural gas facility across state lines without a certificate of "public convenience and necessity issued by the Commission." 15 U.S.C. § 717f(c)(1)(A).

The NGA is not the only barrier to entry into the natural-gas market. Before obtaining a certificate of public convenience and necessity, natural-gas companies must comply with the National Environmental Policy Act (NEPA). Pub. L. No. 91-190, 83 Stat. 852 (1970). NEPA requires federal agencies to prepare "a detailed statement" regarding the environmental impacts of any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). "Action" includes "not only when an agency proposes to build a facility itself, but also whenever an agency makes a decision which permits action by other parties which will affect the quality of the environment." *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1088 (D.C. Cir. 1973). Because "[p]ractically every major construction project authorized by [an agency] affects

the environment to some degree," any attempt to build across state lines entails NEPA review. *Nat'l Audubon Soc'y v. Watt*, 678 F.2d 299, 314 (D.C. Cir. 1982) (MacKinnon, J., concurring).

Once triggered, NEPA requires agencies to "take a 'hard look' at the environmental consequences" of their proposed action. *Baltimore Gas & Elec. Co., Inc. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). This includes assessing "the environmental impact of the proposed action, any unavoidable adverse environmental effects of the action, and potential alternatives to the action." *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 906 (D.C. Cir. 2024) (internal quotations omitted). It also requires "inform[ing] the public of the environmental concerns that were considered in the agency's decisionmaking." *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1150 (D.C. Cir. 2001). Unless the Commission can determine that a "proposed project would have no significant environmental impact," it must "prepare a full-blown environmental impact statement [EIS]." *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 270 (D.C. Cir. 2015). And to make a no-significant-impact determination, FERC must prepare an almost equally burdensome Environmental Assessment (EA) that sifts through similar factors. *See Grand Canyon Tr. v. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002), *as amended* (Aug. 27, 2002).

NEPA review "involves an almost endless series of judgment calls," *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987), costing developers considerable "time and [] money" and tying up projects in red tape. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).[1] These costs and delays are only the first barrier to

---

[1] *See, e.g.*, *Sierra Club v. Dep't of Energy*, 134 F.4th 568, 570–72 (D.C. Cir. 2025) (over a decade of review and litigation and the

industry. As we recently stated, "[a]s night follows day, an environmental challenge follows [an agency's] approval of a natural gas pipeline," leading to still more time and expense while a challenge makes its way through the courts to review the vast compendium that is the Environmental Impact Statement. *Citizens Action Coal. of Indiana, Inc. v. FERC*, 125 F.4th 229, 235 (D.C. Cir. 2025); *see, e.g.*, *Eagle Cnty. v. Surface Transp. Bd.*, 82 F.4th 1152, 1180 (D.C. Cir. 2023) (rejecting a 3,600-page EIS prepared over more than two years because the agency did not assess environmental impacts "that it lack[ed] authority to prevent, control, or mitigate"), *rev'd and remanded sub nom. Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, No. 23-975, 2025 WL 1520964 (May 29, 2025) (adding three years' delay atop the agency's two-year approval process). Today's case is a testament to environmental review run amok.

## B. Factual Background

In October 2017, FERC approved Mountain Valley's Mainline Project, a plan to build roughly 300 miles of natural-gas pipeline stretching from West Virginia to Virginia. Order Issuing Certificates and Granting Abandonment Authority, *Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 (Oct. 13,

---

compilation of a 1,500-page EIS); *Indian River Cnty. v. Dep't of Transp.*, 945 F.3d 515, 524 (D.C. Cir. 2019) (NEPA review over two years included more than 15,400 written comments and an EIS over 600 pages in length); *Village of Barrington. v. Surface Transp. Bd.*, 636 F.3d 650, 653 (D.C. Cir. 2011) (re-routing freight trains triggered a 3,500-page draft EIS that received nearly 13,500 comments and resulted in approximately 400 days of pre-litigation delay); *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 862 (D.C. Cir. 2006) (preparation of EA took over four years and generated almost 900 pages of data and analysis examining potential environmental impacts).

2017).  In November 2018, Mountain Valley applied for a § 7 certificate to build the Southgate Project, an extension of Mainline that would connect the Virginia terminus to two North Carolina counties.  After a year and a half, FERC approved Southgate's certificate of public convenience and necessity.  Order Issuing Certificate, *Mountain Valley Pipeline, LLC*, 171 FERC ¶ 61,232 (June 18, 2020), *order on reh'g*, 172 FERC ¶ 61,261 (Sept. 17, 2020).  Because of Southgate's interconnectivity with Mainline, FERC required Mountain Valley to obtain other federal permits for Mainline before it could commence construction on Southgate.  The Commission also conditioned its approval on Mountain Valley's completion of Southgate within three years.

Unfortunately for Southgate, Mainline remained mired in delay.  Environmental groups—comprised primarily of Petitioners—began their battle to stop Mainline.  In July 2018, the groups convinced the Fourth Circuit to vacate rights of way granted by the Bureau of Land Management (BLM) and United States Forest Service (USFS) based on violations of NEPA and of the National Forest Management Act.  *See Sierra Club, Inc. v. Forest Serv.*, 897 F.3d 582, 587 (4th Cir. 2018).  In response, FERC ordered Mountain Valley to temporarily suspend activity on Mainline before reauthorizing partial construction in August.  No sooner did Mountain Valley resume building Mainline than a new environmental challenge halted it.  In October, the Fourth Circuit vacated an Army Corps of Engineers Clean Water Act permit.  *See Sierra Club v. Army Corps of Eng'rs*, 905 F.3d 285 (4th Cir. 2018) (vacating order), *as amended* 909 F.3d 635 (Nov. 27, 2018) (opinion explaining order).  A few months later, we found a separate challenge to Mainline less than meritorious and, in an unpublished judgment, dismissed the petitions.  *See Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *3 (D.C. Cir. Feb. 19, 2019).  But then the Fourth Circuit again froze Mainline,

this time vacating a Fish and Wildlife Services (FWS) decision under the Endangered Species Act. *See* Order Granting Stay, *Wild Va. v. Dep't of the Interior*, No. 19-1866 (4th Cir. Oct. 11, 2019).

Due to this multicircuit litigation, FERC ordered Mountain Valley to suspend all construction on Mainline in October 2019. In late 2020, the Commission extended Mountain Valley's deadline to complete Mainline and the FWS and Army Corps issued new authorizations, but the Fourth Circuit once again stayed the authorizations pending appeal. *Sierra Club v. Army Corps of Eng'rs*, 981 F.3d 251, 265 (4th Cir. 2020). We rejected a request to enter a stay pending appeal of FERC's Mainline extension order, *see Sierra Club v. FERC*, No. 20-1512, 2021 WL 1044965, (D.C. Cir. Feb. 19, 2021), but the Fourth Circuit again held up essential agency approvals— this time from the USFS and the BLM—for further environmental consideration. *See Wild Va. v. USFS*, 24 F.4th 915, 932 (4th Cir. 2022). This Court later dismissed all but one challenge to Mainline's deadline extension, finding that FERC failed to explain adequately its reason for dismissing certain concerns about soil erosion. *See Sierra Club v. FERC*, 68 F.4th 630, 650–51 (D.C. Cir. 2023), *opinion vacated and superseded*, No. 20-1512, 2023 WL 5537562 (D.C. Cir. Aug. 25, 2023) (dismissing appeal as moot). But unlike the Fourth Circuit, this Court remanded without vacatur to allow prompt "resum[ption of] construction." *Id.* at 652.

Meanwhile, a new round of litigation commenced once FERC approved the Southgate pipeline construction. But Petitioners found a less receptive audience on this side of the Potomac. This Court unanimously affirmed FERC's Southgate approval and held that its "fulsome" EIS "meets NEPA's mark." *Sierra Club v. FERC* (*Southgate I*), 38 F.4th 220, 233 (D.C. Cir. 2022). But because FERC's stop-work order

remained in place as to Mainline, Southgate could not proceed. State permitting delays further slowed Southgate. *See, e.g.*, *Mountain Valley Pipeline, LLC v. N.C. Dep't of Env't Quality*, 990 F.3d 818, 821 (4th Cir. 2021).

With Mountain Valley facing death by a thousand cuts, the Congress eventually stepped in. On June 3, 2023, the Fiscal Responsibility Act of 2023 became law, § 324 of which "ratifie[d] and approve[d] all" federal permits necessary for construction of Mainline and directed the relevant federal agencies to "maintain . . . [their] approvals." Pub. L. No. 118-5, § 342(c), 137 Stat. 10, 47 (2023). To prevent future litigants from scuttling the project, the Congress stripped the federal courts of jurisdiction to hear additional challenges to Mainline's permit approvals and vested this Court with exclusive jurisdiction to decide only a constitutional challenge, if any, to the law. *Id.* § 342(e)(1)–(2). The Fourth Circuit had other plans. Notwithstanding the jurisdiction-stripping provision, it entered two stays of agency approvals of Mountain Valley's permits. *See Wilderness Soc'y v. USFS*, No. 23-1592, 2023 WL 4784199, at *1 (4th Cir. July 10, 2023); *Appalachian Voices v. Dep't of the Interior*, No. 23-1384, 2023 WL 4784194, at *1 (4th Cir. July 11, 2023). Mountain Valley, supported by the Solicitor General, filed an emergency stay application to the Supreme Court, which granted the application and vacated the stays. *See Mountain Valley Pipeline, LLC v. Wilderness Soc'y*, 144 S. Ct. 42 (2023).

Only after intervention by both the Congress and the Supreme Court did the Fourth Circuit give up the ghost and dismiss the appeals for want of jurisdiction, with two judges writing separately to warn that their inability to flyspeck FERC's environmental processes "threatens to disturb the balance of power between co-equal branches of government." *Appalachian Voices v. Dep't of the Interior*, 78 F.4th 71, 84

(4th Cir. 2023) (Thacker, J., concurring); *see also id.* at 82 (Gregory, J., concurring) ("I agree with Judge Thacker[] . . . that 'Congress has tipped the balance of power in its favor given that this provision requires us to allow another co-equal court [the D.C. Circuit] to answer questions. . . .'"). *But see Sheldon v. Sill*, 49 U.S. (8 How.) 441, 449 (1850) ("Congress may withhold from any court of its creation jurisdiction of any of the enumerated controversies . . . . No one of them can assert a just claim to jurisdiction exclusively conferred on another, or withheld from all.").

FERC lifted its stay of Mainline's development on June 28, 2023 and construction immediately resumed, with the project entering service in June 2024—nearly seven years after Mountain Valley first sought federal approval to lay its pipes. But this protracted saga was still not over. Mountain Valley's deadline to complete Southgate—which was conditioned on Mainline's permit approvals—was June 18, 2023. By that date, Mountain Valley had not even begun construction of Southgate due to the years-long construction delays imposed on Mainline. Accordingly, on June 15 Mountain Valley asked FERC for a three-year extension of its deadline. That extension gave Petitioners yet another opportunity to mire Mountain Valley in the bog of environmental review, producing the instant case.

As these facts should make plain, something went seriously awry in our environmental review. For five years, the Fourth Circuit handed down edict after edict halting Mainline's progress, ended only by the Congress's intervention. Most developers are not so fortunate. Construction of our nation's vital infrastructure must now navigate endless veto-gates in order to proceed, leading many projects to fail. As explained below, I believe the judiciary bears much of the blame.

## II. ANALYSIS

In 1969, the Congress enacted NEPA "to create and maintain conditions under which man and nature can exist in productive harmony" while "fulfill[ing] the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331(a). In other words, the Congress sought to "balance" the desire for robust economic growth with a need to limit the environmental degradation that can sometimes accompany development. *Id.* § 4331(b)(5). I believe the judiciary may have lost sight of that balance.

## A. NEPA Over Time

As originally enacted, NEPA's domain was quite limited. As a purely "'procedural' statute intended to ensure 'fully informed and well-considered' decisionmaking," NEPA instructed agencies to simply consider the environmental impacts of their activity. *New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)). It did not detail what form the consideration must take nor did it mandate substantive outcomes. Instead, the Congress imposed a modest look-before-you-leap requirement on agencies. So long as the agency considered "the adverse environmental effects of the proposed action," it remained free to "decid[e] that other values outweigh the environmental costs." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Yet over time, NEPA has morphed into one of the most exacting burdens on the federal government.

*First*, within a year of NEPA's enactment and despite no provision authorizing a private right of action, this Court held that NEPA's processes are to be enforced "to the fullest extent possible"—regardless of "administrative difficulty, delay or

economic cost." *Calvert Cliffs' Coordinating Comm., Inc. v. Atomic Energy Comm'n*, 449 F.2d 1109, 1115 (D.C. Cir. 1971). The opening vignette of our decision "promise[d] . . . a flood of new litigation" allowing the judicial branch to "assist[] in protecting our natural environment" against what it viewed as "the destructive engine of material 'progress.'" *Id.* at 1111. This was the start of an epoch that was heralded as "a new era in the history of . . . administrative agencies and reviewing courts," one in which courts would "insist on strict judicial scrutiny of administrative action." *Env't. Def. Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 597–98 (D.C. Cir. 1971). By 1972, the Justice Department warned that NEPA "suits to enjoin governmental actions . . . increasingly dominated the kinds of litigation handled by the General Litigation Section." *1972 Att'y Gen. Ann. Rep.* 111, https://perma.cc/7WES-GZHZ. Today, NEPA remains "the most frequently litigated federal environmental statute." Congressional Research Service, *National Environmental Policy Act: Judicial Review and Remedies* 1 (Sept. 22, 2021).

*Second*, the federal courts dramatically expanded NEPA's compliance burden. NEPA is a mere five pages in length, two of which are dedicated to the separate issue of establishing the Council on Environmental Quality (CEQ). Indeed, the operative language of the statute comprises a single, albeit run-on, sentence:

> The Congress authorizes and directs that, to the fullest extent possible . . . all agencies of the Federal Government shall—(C) include in every . . . major Federal action significantly affecting the quality of the human environment a detailed statement by the responsible official on—(i) the environmental impact of the proposed action, (ii) any adverse environmental

> effects which cannot be avoided should the
> proposal be implemented, (iii) alternatives to
> the proposed action . . . .

Pub. L. No. 91-190 § 102(C), 83 Stat. 852, 853 (1970).  The statute does not specify how major the action, significant the effect or detailed the statement must be.  Yet from "this vaguely worded statute," lower courts divined an entire "'common law' of NEPA."  *Kleppe v. Sierra Club*, 427 U.S. 390, 421 (1976) (Marshall, J., concurring in part and dissenting in part).  Under what would eventually be termed "hard look" review, courts took it upon themselves to decide whether the agency's detailed statement on environmental impact was sufficiently integrated into its decision making.  It did not matter if the judge could find no fault in an agency's bottom-line decision; if it failed to consider some environmental issue to the degree the court deemed satisfactory, the agency (and, by extension, the developer) faced an injunction that could shut it down for years or even permanently.

What courts considered necessary to comply with NEPA continued to grow, as did the scope of agency action that triggered NEPA review.  *See, e.g.*, *Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 834–85 (D.C. Cir. 1972) (holding that an agency's consideration of reasonable alternatives must consider alternatives that the agency lacks authority to adopt, including an inquiry into hypothetical legislation the Congress could one day adopt); *Minnesota Pub. Int. Rsch. Grp. v. Butz*, 498 F.2d 1314, 1321–22 (8th Cir. 1974) (*en banc*) (all but writing out the term "major" from "major federal action" because it "does little to foster the purposes of the Act" and reading NEPA to cover "indirect effects as well as direct effects" with no textual basis).

Interest groups quickly learned they had a powerful new tool to strike down any development they opposed. In response, agencies began to take longer with their reviews, issuing ever more detailed assessments in an attempt to stave off litigious opponents and skeptical judges. In 1981, the CEQ concluded that "even large complex energy projects" could complete an EIS within one year. CEQ, *Memorandum to Agencies*, 46 Fed. Reg. 18,026, 18,037 (Mar. 23, 1981). And it advised agencies that EISs should ordinarily be "less than 150 pages," "kept concise" and "no longer than absolutely necessary." 43 Fed. Reg. 55,978, 55,994–95 (Nov. 29, 1978). By 2018, average EIS preparation had ballooned to four and one-half years. *See* CEQ, *Environmental Impact Statement Timelines (2010-2018)* at 1 (June 12, 2020), https://perma.cc/ D9WW-D4XA. The average EIS length is now over 660 pages, atop an additional one thousand pages of appendices. *See* CEQ, *Length of Environmental Impact Statements (2013-2018)* at 1, 3 (June 12, 2020), https://perma.cc/9UWN-MPF7. "Of the 136 EISs finalized in 2020, the mean preparation time was 1,763 days, over 4.8 years. For EISs finalized between 2013 and 2017, page count averaged 586 pages, and appendices for final EISs averaged 1,037 pages." Eli Dourado, *Much More Than You Ever Wanted to Know About NEPA*, Utah State Univ. (Oct. 20, 2022), https://perma.cc/5QCS-FB3C.

And all of this paperwork takes place *before* the inevitable litigation that follows. That litigation adds an average of 4.2 more years of delay. *See* Nikki Chiappa et al., *Understanding NEPA Litigation: A Systematic Review of Recent NEPA-Related Appellate Court Cases* 5–6, Breakthrough Inst. (2024), https://perma.cc/V7UD-YYPB. Although the Supreme Court has ruled for the government in *every* NEPA challenge to come before the Court, it has heard only eighteen merits cases over the lifespan of the Act, leaving hundreds of lower court cases a

14

year that continue to push the boundaries of the law.[2] Moreover, most circuits developed and refined their NEPA precedents during the 1970s and 80s, the heyday of a

---

[2] The Supreme Court has repeatedly admonished the lower courts—ours in particular—to temper their broad read of NEPA. *See, e.g.*, *Kleppe v. Sierra Club*, 427 U.S. 390, 406 (1976) (warning against "assertion[s] of judicial authority" untethered from "the statutory language" and "invit[ing] judicial involvement in the day-to-day decisionmaking process of the agencies"); *Vt. Yankee*, 435 U.S. at 557–58 (cautioning that NEPA does not allow courts to set aside decisions "simply because the court is unhappy with the result reached" and that policy considerations "are *not* subject to reexamination in the federal courts under the guise of judicial review of agency action"); *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–28 (1980) (admonishing lower courts that "once an agency has made a decision subject to NEPA's procedural requirements," the court is not free to "interject itself within the area of discretion of the executive as to the choice of the action to be taken") (quotations omitted); *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 776 (1983) ("Congress [did not] . . . extend NEPA as far as the Court of Appeals has taken it"); *Baltimore Gas & Elec. Co.*, 462 U.S. at 97 ("Congress has assigned the courts only the limited . . . task of reviewing agency action," with policy questions committed to "Congress and the agencies to which Congress has delegated authority"); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886–89 (1990) (rejecting the claim that enjoying public land "in the vicinity" of a project area conferred standing to challenge the agency's NEPA compliance); *Seven Cnty. Infrastructure Coal.*, 605 U.S. __ (2025), Slip Op. at 8 ("Over time, some courts have assumed an aggressive role in policing agency compliance with NEPA . . . . [but] the central principle of judicial review in NEPA cases is deference"). Of these seven decisions, all involved the reversal the lower court—and in all but one instance, the reversal of our Circuit.

freewheeling approach to statutory interpretation that emphasized legislative purpose over legislative text.

*Third*, the courts significantly liberalized standing requirements. In 1970, the Supreme Court began to allow challenges to agency action by any litigant who could show an injury in fact that was "arguably within the zone of interests" protected by the statute. *Ass'n of Data Processing Serv. Org. v. Camp*, 397 U.S. 150, 153 (1970); *accord United States v. Students Challenging Regul. Agency Procs. (SCRAP I)*, 412 U.S. 669, 686–87 (1973) (applying and expanding *Data Processing* for NEPA challengers); *see also Lujan*, 497 U.S. at 889 (acknowledging that *SCRAP* embraced an "expansive" approach to standing that "has never since been emulated by th[e] Court").

Around the same time, the Supreme Court blessed associational standing with little explanation. *See Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1168 (D.C. Cir. 2025) (Henderson, J., concurring). That one-two punch flooded the courts with suits from organizations opposed to new development. *See* Chiappa et al., *supra* at 7 (documenting that roughly three-fourths of NEPA cases are brought by interest groups). As a result, environmental groups have been able to bring endless challenges to development, at times succeeding outright but more often by dint of delay.

*Fourth*, the courts have treated nonbinding guidance as a judicially enforceable mandate. Title II of NEPA created the Council on Environmental Quality within the Executive Office of the President to assist with NEPA's implementation. In 1977 President Carter issued Executive Order 11,991, 42 Fed. Reg. 26,967 (May 24, 1977), to empower CEQ to issue regulations guiding the federal bureaucracy's "implementation of the procedural provisions of [NEPA]." *Id.* These

regulations were issued through notice and comment and published in the Federal Register, giving them the façade of binding regulations. Although the Congress never granted CEQ rulemaking authority, courts began to treat these rules as judicially enforceable. The CEQ regulations added yet another layer of burden to NEPA compliance. For example, CEQ required that an EIS include a "cumulative impact" analysis addressing "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions" of any agency or individual. 40 C.F.R. § 1508.7 (repealed 2025); *see also id.* § 1508.25 (repealed 2025). This requirement appears nowhere in NEPA itself, yet courts have treated it as a binding mandate subject to judicial enforcement. *See, e.g.*, *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006).

Under NEPA, agencies can conclude that their proposed action has no significant environmental effect—a conclusion known as a Finding of No Significant Impact (FONSI). President Carter's CEQ required agencies to prepare EAs before issuing a FONSI. An EA was intended to be a "concise public document . . . that is used to support an agency's determination of whether to prepare an environmental-impact statement or a finding of no significant impact." 40 C.F.R. § 1508.1(j) (repealed 2025). These EAs were required to support a FONSI with evidence and examine alternatives and—because CEQ regulations were treated as law—became subject to judicial review.

The result produced, in effect, the full-blown EIS if the agency chose the EA route. EAs "ballooned in size from about ten pages in 1978 to an average of 500 pages in 2020, with some even reaching 4,007 pages." Aidan Mackenzie, *Environmental Assessment Reform*, Inst. for Progress (May 9, 2023), https://perma.cc/G9BA-BS4T. Agencies prepared

slightly over 700 EISs between 2012 and 2015 but they issued over *40,000* EAs during that same time. *See* CEQ, *The Fourth Report on Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act (NEPA)* 3-4 (Oct. 2016), https://perma.cc/7KGP-HM7P.

Because of judicial tinkering with NEPA's original design, litigation became a fixed feature of agencies'—and developers'—efforts to undertake any new action: building housing, power plants, ports, telecommunications and other critical infrastructure suddenly became enmeshed in years of paperwork delay and lawsuits.

A proposal to raise an existing bridge 64 feet generated thousands of pages of environmental review, millions of dollars in expense and years of work by nineteen separate agencies—and that was on a fast-track review. Sam Roberts, *High Above the Water, but Awash in Red Tape*, N.Y. Times (Jan. 2, 2014). This was all before the inevitable litigation that followed. *See Coal. for Healthy Ports v. U.S. Coast Guard*, No. 13-cv-5347, 2015 WL 7460018 (S.D.N.Y. Nov. 24, 2015). As wildfires engulf California, the Forest Service cannot conduct controlled burns without first conducting years of NEPA analysis. *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1026, 1033 (9th Cir. 2007) (enjoining three proposed burn projects and concluding that NEPA violations are inherently "irreparable" and "usually favor the issuance of an injunction").[3]

---

[3] Indeed, the Forest Service has for decades warned that it cannot fulfill its mission because it "is so busy meeting procedural requirements, such as preparing voluminous plans, studies, and associated documentation," resulting in "paralysis" and

Although infrastructure development is NEPA's archetypal target, NEPA's blast radius is boundless. Consider just a few examples. After *District of Columbia v. Heller*, 554 U.S. 570 (2008), the National Park Service and Fish and Wildlife Services revised their rules to allow concealed carry in national parks consistent with state and local law. Gun-control activists successfully convinced a court to enjoin the rule because the agencies did not conduct a NEPA review of the rule's environmental impact. *See Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 6–8 (D.D.C. 2009), *case dismissed*, No. 09-5093, 2009 WL 2915013 (D.C. Cir. Sept. 8, 2009). Anti-immigration groups sued to enjoin DHS's deportation and visa policies on the theory that any increase to the U.S. population causes environmental harm requiring NEPA review. *See Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1004 (9th Cir. 2021). Not even the national defense has been spared. The U.S. Navy spent years subject to NEPA review in order to construct training fields for carrier aircraft. *See Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 180–81 (4th Cir. 2005). The U.S. Army was prohibited from increasing the use of its training site to accommodate a growing troop population based on an inadequate EIS. *See Not 1 More Acre! v. Dep't of Army*, No. 08-cv-828, 2009 WL 2913218, at *1, 9–10 (D. Colo. Sept. 8, 2009).

In 1995, a storm toppled trees across nearly 35,000 acres of the Six Rivers National Forest in California. Fuel loads—a measure of the amount of combustible material in an area—increased tenfold. *See* USFS, *The Process Predicament supra* at 7. For the next three years, the Forest Service treated only 1,600 acres while wading "through analytical and procedural

---

"catastrophe." U.S. Forest Service, *The Process Predicament* 7 (June 2002), https://perma.cc/G3HT-HEEK.

requirements." *Id.* In September 1999, the Megram and Fawn Fires torched the entire area—plus an additional 90,000 acres covering national forests, private property and an Indian reservation. *Id.*; *see also Sierra Club v. Bosworth*, 199 F. Supp. 2d 971, 977 (N.D. Cal. 2002). The fires created still more dead and dying timber that could fuel future fires. More than seven years after the storm, USFS's recovery efforts were challenged under NEPA, enjoined and the entire effort was left "in limbo." USFS, *The Process Predicament supra* at 7; *Bosworth*, 199 F. Supp. at 992–93.

Although industry has borne the brunt of NEPA, it is all Americans who face what President Reagan called the "hidden" tax. Ronald Reagan, *Address to the Nation on the Economy* (Feb. 1981). Government costs more and delivers less. Fear of legal risk permeates every facet of agency decision making. The bureaucracy produces reams of paperwork that is read by and helps no one. And yet still we face what was warned of a century past: a "government by injunction."[4]

### B. NEPA Going Forward

If this were truly what the Congress required, so be it. Sometimes legislatures enact "illogical" or "unscientific" statutes, *Metropolis Theater Co v. City of Chicago*, 228 U.S. 61, 69–70 (1913). We do not "sit as a superlegislature to judge

---

[4] Charles N. Gregory, *Government by Injunction*, 11 Harv. L. Rev. 487 (1898); *see also* 1896 Democratic Party Platform, Am. Presidency Project, https://perma.cc/TE6P-SZHV (warning of "government by injunction . . . a new and highly dangerous form of oppression by which Federal judges . . . become at once legislators, judges and executioners"); William Howard Taft, *First Annual Message* (Dec. 7, 1909) (using the State of the Union to call on the Congress to limit the federal injunctive power).

the wisdom or desirability of legislative policy determinations." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). But NEPA's minefield is a quintessentially judicial construction. The courts assumed the role of NEPA-police, radically expanded the compliance burden and threw open the standing floodgates to all manner of interest groups. "A course correction of sorts is appropriate to bring judicial review under NEPA back in line with the statutory text and common sense." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at __, Slip Op. at 13. As then-Judge Thomas colorfully put it, "just as NEPA is not a green Magna Carta, federal judges are not the barons at Runnymede." *Citizens Against Burlington*, 938 F.2d at 194.

Recently, we took one small step toward curing NEPA's metastasis. *See Marin Audubon Soc'y*, 121 F.4th at 912–15 (D.C. Cir. 2024) (holding that CEQ's rules are not judicially enforceable); *see also Iowa v. Council on Env't. Quality*, 765 F. Supp. 3d 859 (D.N.D. 2025) (adopting our reasoning). I think more remains to be done. The Congress and the Executive have also both taken steps recently to rein in NEPA. *See* BUILDER Act, Pub. L. No. 118-5, div. C, tit. III, § 321, 137 Stat. 11, 38–46 (2023); *Removal of National Environmental Policy Act Implementing Regulations*, 90 Fed. Reg. 10,610 (Feb. 25, 2025). I believe there are also steps the courts can, and should, take.

*First*, and foremost, cabining "hard look" review. As explained, NEPA now involves hundreds or thousands of pages of environmental review. And what requires agencies to toil away? The answer lies not in NEPA's sparse language but in the judiciary's gloss on the text. The courts have imposed procedural hurdles found nowhere in statute. Too often, our approach amounts to precisely the sort of "flyspeck[ing]" that arbitrary and capricious review is meant to avoid. *Sierra Club*

*v. Dep't of Energy*, 867 F.3d 189, 196 (D.C. Cir. 2017) (quotations omitted). Because NEPA is entirely "procedural" and does not "dictate particular decisional outcomes," *id.* at 196, litigants have concentrated on dissecting the minutiae of agencies' deliberative processes. As the Supreme Court has been at pains to emphasize, an agency's NEPA analysis "cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man." *Vermont Yankee*, 435 U.S. at 551.

An agency's judgment that some matter is not germane to the action under review—perhaps as much as its substantive outcome—is a byproduct of its technical expertise and thus entitled to judicial deference. *See City of Waukesha v. EPA*, 320 F.3d 228, 247 (D.C. Cir. 2003) (emphasizing the "extreme degree of deference" we accord agency decisionmaking within its technical expertise); *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377 (1989) (same); *cf. Citizens Against Burlington*, 938 F.2d at 195 (explaining that "an agency bears the responsibility for deciding which alternatives to consider in an [EIS]" and that the rule of reason "governs both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them") (internal quotations omitted). Indeed, as the Supreme Court has recently pressed, "the *central* principle of judicial review in NEPA cases is deference" and that deference is "substantial." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at __, Slip Op. at 8 (emphasis added).

Challengers, meanwhile, have a tough row to hoe. To prevail, they must show that the agency's environmental review "is not a product of reasoned decisionmaking," which "is 'a heavy burden,' since [arbitrary and capricious review] entails a 'very deferential scope of review' that forbids a court from 'substituting its judgment for that of the agency.'" *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 495 (D.C. Cir. 2016) (citation

modified).  It should be the rare case that fails this deferential standard.  And if the Congress's recent efforts to crimp the extent and duration of NEPA review is to have any teeth, *see* 42 U.S.C. § 4336a(e), (g) (limiting an EIS to 150 pages and two years for completion and an EA to 75 pages and one year), courts cannot demand that agencies run down every rabbit hole.

*Second*, a lot of our atextual NEPA precedent is no longer good law.  Without undertaking a comprehensive evaluation, I make the following observations.  As originally enacted, NEPA applied only to "major Federal action[s] significantly affecting the quality of the human environment."  Pub. L. No. 91-190 § 102(C), 83 Stat. 852, 853 (1970).  Following the Congress's 2023 NEPA amendments, *Minnesota Public Interest Research Group*—the landmark decision interpreting "major federal action" to, in effect, cover any federal action—is no longer good law.  498 F.2d at 1321–22; *see* 42 U.S.C. § 4336e(10) (defining major action to require "substantial [f]ederal control and responsibility").  Likewise, the original Act included no definition of "significantly affecting."  Until recently, CEQ— whose regulations we erroneously treated as binding, *see Marin Audubon Soc'y*, 121 F.4th at 912–15—construed the term to require a look at "context" and at ten separate "intensity" factors.  40 C.F.R. § 1508.27 (1979).  That convoluted multifactor test was supplanted by the 2023 amendments that use "reasonable foreseeability" as the threshold for an EIS.  *See* 42 U.S.C. § 4336(b)(1).

In a similar vein, the CEQ had allowed categorical NEPA exclusions but only for actions that "do not individually or cumulatively have a significant effect on the human environment."  40 C.F.R. §§ 1501.4, 1508.4 (2020).  The Congress's NEPA amendments reject the "cumulative" fillip, instead directing agencies to identify classes of actions that

"normally do not significantly affect … the human environment." 42 U.S.C. § 4336e(1).

*Third*, even if an agency errs in its NEPA analysis, courts should not lose sight of the APA's command that we take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706; *see Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007) ("In administrative law, as in federal civil and criminal litigation, there is a harmless error rule") (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004)). This is so even if there are "serious arguments that the [agency] erred" in its decision. *Prohibition Juice Co. v. FDA*, 45 F.4th 8, 25 (D.C. Cir. 2022). A remand under those circumstances "would be an idle and useless formality" that "convert[s] judicial review of agency action into a ping-pong game." *Morgan Stanley Capital Grp. Inc. v. Pub. Util Dist. No. 1*, 554 U.S. 524, 544–45 (2008) (citation modified).[5] And not every error in an EIS requires "a court to vacate the agency's ultimate approval of a project." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at __, Slip Op. at 14.

*Fourth*, I believe courts should take a "hard look" at the standing doctrine. NEPA challenges are mounted overwhelmingly by interest groups with little to no tie to the challenged project. Rather than assert their own injuries, these groups rely on associational standing to assert the rights of

---

[5] The Supreme Court has recently noted "tension" between its holding in *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), and the APA's harmless error standard, without resolving the conflict. *FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 929–31 (2025). But this Court—like every circuit—has adopted "a practice of upholding unsound agency decisions when they are confident that the agency would reach the same decision on remand." Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 Colum. L. Rev. 253, 302 n.328 (2017).

others. As I have urged elsewhere, associational standing is discordant with the basic precepts of Article III—namely, that a party "must assert his own legal rights" and "cannot rest his claim to relief on the legal rights of third parties." *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017) (citation modified); *see Indus. Energy Consumers of Am.*, 125 F.4th at 1167–70 (D.C. Cir. 2025) (Henderson, J., concurring).[6]

For similar reasons, it is hard to fathom how these interest groups are proper parties under the APA. They cannot sensibly be said to be "suffering legal wrong" or to be "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. NEPA, after all, includes no private right of action and, insofar as it is actionable under the APA, an uninjured organization—as opposed to its membership—has suffered no harm. *Cf. Kan. City Power & Light Co. v. McKay*, 225 F.2d 924, 932 (D.C. Cir. 1955) (emphasizing the limits of § 702 as understood at the time of enactment).

Even under the strained constitutional and statutory interpretation necessary to allow uninjured organizations to raise NEPA claims, courts must still assure themselves of standing. Take this case. Here, Petitioners sought to prove standing through affidavits from members who live or recreate in areas that will purportedly be affected by Southgate. However, none of the affiants here alleges membership in Petitioners Center for Biological Diversity, Chesapeake

---

[6] Others have similarly recognized the mismatch between associational claims and Article III. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring); *Mi Familia Vota v. Fontes*, 129 F.4th 691, 764 (9th Cir. 2025) (Bumatay, J., dissenting); *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 540 (6th Cir. 2021).

Climate Action Network or Haw River Assembly. One individual alleges that she has "worked closely with . . . Chesapeake Climate Action Network" but she goes on to acknowledge that she is "not currently a member." Add. 34 ¶ 5. She also alleges that she "joined a paddling trip on the Haw River organized by Haw River Assembly," yet does not allege that she ever joined the Assembly. Add. 40 ¶ 17. And no affiant alleges any relationship to the Center for Biological Diversity. It is Petitioners' burden to "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

Even if the remaining Petitioner organizations have alleged sufficient facts to establish our jurisdiction under current doctrine, the Center for Biological Diversity, Chesapeake Climate Action Network and Haw River Assembly have no claim to the remedial power of this Court. Granted, as long as one plaintiff seeking the same relief has standing, the Court need not inquire whether others also do. *Food & Water Watch v. FERC*, 28 F.4th 277, 284 (D.C. Cir. 2021). And so long as courts continue to impose universal remedies under the APA, the inclusion of other parties may prove to be a distinction without a difference, although serious questions have been raised about whether the APA authorizes such broad-based relief.[7] At a minimum, however, closer

---

[7] *See, e.g.*, Aditya Bamzai, *The Path of Administrative Law Remedies*, 98 Notre Dame L. Rev. 2037, 2040–42 (2023); William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153, 169–70 (2023); John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*, 40 Yale J. On Regul. Bull. 119, 119–21 (2023); *United States v. Texas*, 599 U.S. 670, 695–700 (2023) (Gorsuch, J., with Thomas and Barrett, JJ., concurring in the judgment); Memorandum from the Att'y Gen. to the Heads of Civil Litigating Components & U.S. Att'ys, *Litigation Guidelines for*

scrutiny of an organization's standing may help to dispose of some of the claims in future litigation. *See, e.g.*, *Food & Water Watch*, 28 F.4th at 284–285.

*Fifth*, and finally, I believe courts should temper their grants of preliminary injunctive relief in NEPA disputes. The lodestar for interim relief is preserving the status quo—not previewing the merits. *See Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969). As the Supreme Court has emphasized, "[t]he purpose of [] interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017) (citation omitted). In other words, a "preliminary injunction is not a shortcut to the merits," *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 197 (3d Cir. 2024), but a means to shield the plaintiff "from irreparable injury" and to "preserve[] the trial court's power to adjudicate the underlying dispute." *Select Milk Prods., Inc. v. Johanns*, 400 F.3d 939, 954 (D.C. Cir. 2005) (Henderson, J., dissenting); *see also* Samuel L. Bray, *The Purpose of the Preliminary Injunction*, 78 Vand. L. Rev. __ (forthcoming 2025).

From the Founding, equitable relief was intended to be available only "*in extraordinary cases*, which are *exceptions* to general rules." The Federalist No. 83 (A. Hamilton) (Rossitier ed., 1961). As with all exercises of the injunctive power, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). It can be months or often years before an enjoined development that is ultimately found to be lawful

---

*Cases Presenting the Possibility of Nationwide Injunctions* 7–8 (Sept. 13, 2018), https://perma.cc/A6CM-5FU4.

is able to move forward. Before a plaintiff can obtain a preliminary injunction, he must make a strong showing: (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor" and (4) "that an injunction is in the public interest." *Id.* at 20.

Despite the four-factor test, some courts have trended towards rolling each independent inquiry into a blanket "likelihood of success on the merits" test. *See, e.g.*, *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). But preliminary injunctive relief "does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32. The driving factor is and ought to be irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("[T]he basis of injunctive relief in the federal courts has always been irreparable harm"); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (explaining that failure to show irreparable harm suffices to deny a preliminary injunction even if the other three factors weigh in favor of issuance (citation omitted)).

Today's case demonstrates the problems of judicial over-reach. Mountain Valley first proposed its Southgate pipeline in 2018. In 2025, we are still debating whether the agency sufficiently studied the merits of the project. Its Mainline project was subject to rule-by-injunction imposed as the result of a ceaseless crusade by interest groups, one of whose founders' goals include "inflict[ing] severe economic pain" and "bring[ing] industrial civilization to its knees." Nicholas Lemann, *No People Allowed*, The New Yorker (Nov. 14, 1999) (quoting the cofounders of Petitioner Center for Biological Diversity). But for the direct intervention of the Congress, Mountain Valley may never have been released from judicial micromanagement.

28

\*   \*   \*

"The true test of a good government," Alexander Hamilton explained, "is its aptitude and tendency to produce a good administration." Federalist No. 68 (Rossiter ed., 1961). NEPA was a modest statute meant to inform an agency during *its* decision-making process. Our deference to the agency should therefore be two-fold: deferential because we are exercising limited "arbitrary and capricious" review of agency action, and deferential because the underlying statute is purely procedural.